MILBURN, Circuit Judge.
 

 Plaintiff Bankruptcy Trustee (“Trustee”) appeals the judgment of the district court in favor of defendant William M. Connelly (“Connelly”) on an award of attorney’s fees. For the reasons that follow, we reverse the judgment of the district court and remand the case with instructions to enter judgment in favor of the Trustee.
 

 I.
 

 A.
 

 The present action was brought by the Trustee pursuant to 11 U.S.C. § 548, which allows a Bankruptcy Trustee to avoid fraudulent conveyances, and pursuant to the equitable-doctrine of constructive trust under Ohio law. The defendant is an attor
 
 *845
 
 ney who received as fees assets in which the Trustee claims an interest.
 
 [1]
 

 Bell
 
 &
 
 Beckwith (“B & B”), a Toledo, Ohio, stock brokerage firm, was placed into receivership under the Securities Investor Protection Act, 15 U.S.C. § 78aaa
 
 et seq.,
 
 when it was discovered that the firm’s managing partner, Edward P. Wolfram, Jr. (“Mr. Wolfram”), had over a period of several years bilked the firm of some $47,000,-000.00. B & B was thereafter found insolvent, and the Trustee was appointed for its liquidation.
 

 The facts surrounding the demise of B & B have been well publicized in the Toledo, Ohio, press. Mr. Wolfram, the firm’s managing partner since 1955, disclosed on or about February 5, 1983, that over a period of at least nine years he had been defrauding the firm of substantial amounts of money. The parties to this appeal have stipulated that approximately $32,000,-000.00 had been fraudulently obtained from the firm by Mr. Wolfram and that this amount, together with interest, amounted to a total indebtedness of $47,000,000.00.
 

 Mr. Wolfram’s fraud was accomplished by inflating the value of certain stocks belonging to Mr. and Mrs. Wolfram. As the stock was fraudulently overvalued, Mr. Wolfram loaned money to himself using the stock as collateral. This money was then used to fund various projects which Mr. Wolfram felt would be profitable.
 

 In the present case, the Trustee seeks to recover assets used by Mr. Wolfram to retain Attorney Connelly in connection with the criminal charges being prepared against Wolfram.
 
 [2]
 
 The parties have
 
 stipulated
 
 that these assets were obtained by Mr. Wolfram through his defrauding B & B. The assets conveyed by Mr. Wolfram to Connelly in payment of his fee included shares of stock, United States Treasury Bills, personal checks, and valuable jewelry. While some of these assets were later remitted to the Trustee, Connelly has retained $150,000.00 as payment of his attorney’s fees.
 
 [3]
 
 J.A. at 71.
 

 As stated above, Connelly concedes that the funds with which he was compensated were fraudulently obtained by Mr. Wolfram, and that the Trustee has shown grounds for both a constructive trust and the existence of a fraudulent conveyance. However, Connelly argues that he took the funds as a bona fide purchaser for value and thus has rights superior to the Trustee’s rights. In support of his argument, Connelly relies on
 
 Restatement of Restitution
 
 § 172(1) (1937):
 

 Where a person acquires title to property under such circumstances that otherwise he would hold it upon a constructive trust or subject to an equitable lien, he does not so hold it if
 
 he gives value for the property without notice of such circumstances.
 

 See also
 
 Ohio Jur.2d
 
 Trusts
 
 § 148 (1962) (Emphasis supplied).
 

 On the other hand, the Trustee argues that although Connelly gave value, he took his fee with notice of the constructive trust. The Trustee further argues that given the suspicious circumstances Connelly was under a duty to inquire as to the source of his fee, and his failure to do so requires a finding of inquiry notice. We agree.
 
 [4]
 

 
 *846
 
 B.
 

 The Wolfram fraud involved in this case began to come to an end on February 4, 1983. At that time, outside auditors at B & B demanded proof of Mr. Wolfram’s assets, which, of course, he was unable to provide. On February 5, 1983, a Saturday, Mr. Wolfram called his family and his personal attorney, Frank McManus, to his home and confessed to all present his fraud.
 

 Mr. Wolfram legitimately owned stock in a Japanese company known as Toto, Ltd. This stock had a value of approximately $1.80 a share. Mr. Wolfram, however, inflated the value of the stock to upwards of $100,000.00 a share. He then used the inflated value of the stock as collateral for loans from B & B. These loan transactions were carried out in the name of Mrs. Wolfram due to New York Stock Exchange regulations prohibiting certain transactions between a broker and his or her brokerage.
 

 Mr. Wolfram entertained various investments with his fraudulently obtained funds. By far the biggest was the Landmark Hotel, a Las Yegas gambling casino, which Mr. Wolfram purchased for $12,500,-000.00. He also purchased a horse ranch in Florida (“The Country Boy Estates”), a cattle ranch in Arkansas (“TZ Land and Cattle Corporation”), a part interest in a Louisiana oil company, and various other properties. The Landmark Hotel was losing money at a marked pace. In an interview with the FBI, Mr. Wolfram stated that the hotel lost approximately $300,000.00 to $400,-000.00 a month for several years, and that these losses were covered with fraudulently obtained funds which Mr. Wolfram wired from Toledo to bank accounts in two Las Vegas, Nevada, banks.
 

 When Mr. Wolfram first disclosed his fraud on February 5, 1983, his personal attorney, Frank McManus, recognized that a more experienced criminal defense attorney was needed. Accordingly, McManus attempted to contact Connelly. However, Connelly was out of the country and could not be reached. Later that same day, the Securities and Exchange Commission filed a petition to place B & B in receivership. During the afternoon, the United States District Court convened in an emergency hearing at the Toledo Express Airport, which McManus attended. United States District Judge Walinski ordered that B & B be placed in receivership and entered a temporary restraining order prohibiting any B & B director, agent, employee, or attorney from in any way disposing of all or any part of B & B assets.
 

 On Sunday, February 6, 1983, McManus again attempted to contact Connelly unsuccessfully. On that day, however, attorneys from a Toledo, Ohio, law firm which represented B & B, met with Mr. and Mrs. Wolfram and McManus to discuss ways of avoiding the closing of B & B. It was agreed that the Wolframs would transfer all their assets to B & B in hopes of providing the firm with sufficient assets to offset the huge debts which resulted from Mr. Wolfram’s fraud. J.A. at 945. Accordingly, Mr. and Mrs. Wolfram entered into an assignment whereby all of their assets were assigned to B & B as security for repayment of the debts owed to B
 
 &
 
 B. The assignment made clear that it extended to all properties belonging to the Wolframs regardless of B & B’s awareness of such property. J.A. at 110.
 

 On Monday morning, February 7, 1983, Connelly and McManus talked by telephone about the Wolfram case. Connelly later testified that he accepted representation of Mr. Wolfram at that time. J.A. at 868. Connelly, McManus and Mr. Wolfram then met together at the United States Courthouse in Toledo to discuss Mr. Wolfram’s case and to meet with the United States Attorneys about the case.
 

 Connelly testified that he raised the question of his fee within the first hour and a half after meeting Mr. Wolfram Connelly stated that his normal practice was to “get his fee up front.” He testified that he told Mr, Wolfram that his firm “could undertake to represent [Mr. Wolfram] but that the fees ... [were] going to ... be substantial, well into six figures if he wanted us to defend him, and he said he did.” J.A.
 
 *847
 
 at 1008. However, Connelly received no payment for his fee at that time.
 

 Connelly also testified that once he was assured his fee would be no problem, he “got busy” with the case. The parties have stipulated that the activities involved in the Wolfram representation consumed nearly all of Connelly’s time for the next several days. On February 9, 1983, Con-nelly first learned of the February 6, 1983, security agreement between the Wolframs and B & B from an article published in a Toledo, Ohio, newspaper in which it was indicated that Mr. Wolfram had transferred his assets, including the Landmark Hotel, to B & B. As Nevada gaming laws apparently prohibit the transfer of a gambling casino without prior approval, Connelly testified that he and McManus felt the disclosure of the February 6 security agreement jeopardized the hotel’s gaming license. Accordingly, McManus and Connelly together sent a letter on February 10, 1983, to B & B’s attorneys repudiating the February 6 security agreement.
 

 On February 10, 1983, Mr. Wolfram entered into an agreement with the United States Attorney’s office. After the agreement was signed, Mr. Wolfram was interviewed by the FBI,
 
 in the presence of both Connelly and McManus,
 
 about his fraudulent scheme. During that interview, Mr. Wolfram made it clear that his fraud involved at least $36,000,000.00. During this February 10, 1983, interview, the following disclosures, among others, were made:
 

 1. The extent of the fraud was at least $36,000,000.00,
 

 2. the Toto, Ltd. stock was used to effectuate this scheme,
 

 3. due to New York Stock Exchange regulations,
 
 all transactions and accounts were established in Mrs. Wolfram’s name,
 

 4. that a number of different margin accounts at B & B were used, including the TZ Land and Cattle account,
 

 5. that the Landmark Hotel was losing large amounts of money and that these losses were covered by wiring money from B & B to
 
 accounts established in Mrs. Wolfram’s name
 
 at the First Interstate Bank of Las Vegas or the
 
 Nevada National Bank
 
 in Las Vegas,
 

 6. that in 1982 Mr. Wolfram loaned Liberty Airlines, Inc., of Toledo, Ohio, $287,-000.00, and,
 

 7. that regardless of the enormity of the fraud Mr. Wolfram’s assets, “if handled properly” could cover the losses.
 

 On either February 10 or 11, 1983,
 
 after having attended the FBI interview
 
 with Mr. Wolfram, and
 
 with knowledge of the February 6 security agreement,
 
 Connelly accepted a retainer check from Mrs. Wolfram in the amount of $50,000.00.
 
 This check was drawn on Mrs. Wolfram’s Nevada National Bank account.
 

 On February 11, 1983, Mr. Wolfram again participated in FBI interviews,
 
 and Connelly was also present.
 
 In this interview, Mr. Wolfram testified as to the amount of funds fraudulently obtained and the estimated value of his assets. He stated that the loss to B & B from his fraud was “forty-four million dollars” and further stated that “a conservative estimate of assets [obtained through the fraud] would be $35,000,000.00, with $49,000,000.00 being a somewhat optimistic estimate.” J.A. at 287-90.
 

 During the afternoon of February 11, 1983, Kevin Joyce, an attorney in Connelly’s firm, was sent to the Wolfram home to collect Connelly’s fee. Mr. Joyce testified that when he arrived at the Wolfram home, he was met at the door by McManus, asked inside, and then
 
 handed a briefcase.
 
 Mr. Joyce stated that he did not at that time look into the briefcase or see anyone putting anything into it. He took the briefcase directly back to the firm’s office and delivered it to Connelly. Connelly took the briefcase into a conference room and opened it in the presence of Mr. Joyce. The
 
 briefcase contained
 
 jewelry, including a Landmark Hotel charm, Landmark Hotel cuff links, a lady’s gold necklace with a horsehead pendant, and a horseshoe diamond ring, $100,000.00 in Treasury notes, 154 shares of Toto, Ltd. stock, 79,996 shares of Liberty Airlines, Inc. stock, and 100 shares of TZ Land and Cattle Company stock.
 

 
 *848
 
 II.
 

 A.
 

 The present case was tried by a magistrate in a bench trial with the consent of the parties. The magistrate concluded that Connelly took his fee as a bona fide purchaser for value without notice, inquiry or otherwise, of-the Trustee’s interest: “I find that Mr. Connelly did not know or have reason to know that the monies which he received as his fee for representing Mr. Wolfram were proceeds of the fraud.” J.A. at 85.
 

 The magistrate’s decision was based on the application of essentially two standards to the notice issue. The first, which we refer to as the insolvency standard, focused on the extent of Mr. Wolfram’s total assets relative to the fraud. The magistrate believed that if Connelly subjectively thought that the total assets belonging to Mr. Wolfram exceeded his fraud, then Connelly should be found to be without inquiry notice. In other words, if Connelly felt that Mr. Wolfram would be able to meet his fraud and still remain solvent, then in the magistrate’s view, Connelly took in good faith:
 

 Awareness of a possible shortfall was, in my opinion, the sine qua non of any duty of inquiry on Mr. Connelly’s part. The question is, therefore, whether there were facts available and known to Mr. Connelly which made the ultimate existence of such shortfall so apparent that the duty to inquire was triggered. I do not believe such facts were available, and I do not believe that a reasonable person in Mr. Connelly’s position would have concluded that a shortfall was likely.
 

 J.A. at 87.
 

 Second, looking to all the facts surrounding the payments, the magistrate found that no other facts served to put Connelly on notice: “I do not find that either singly or in combination the assortment of information set forth by the Trustee leads to the conclusion that Mr. Connelly knew, or should have learned at any pertinent time that he was in receipt of stolen property from an insolvent firm.” J.A. at 89. Pointing to the “rush of events” occurring at the time Connelly undertook Mr. Wolfram’s representation, including the disclosure of the fraud, the negotiations with prosecutors, the attempts to pool together assets, and the negotiating with B & B, the magistrate found Connelly’s behavior “justified.” J.A. at 89. The magistrate concluded that the situation was chaotic and thus that Connelly took without notice and in good faith.
 

 B.
 

 The standard of review in the present case is governed by Federal Rule of Civil Procedure 52(a), which provides that, “[f]indings of fact... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.”
 
 [5]
 
 The Supreme Court has stated that a factual finding may be found clearly erroneous only where “ ‘the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.’ ”
 
 Anderson v. Bessemer City,
 
 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) (quoting
 
 United States v. United States Gypsum Co.,
 
 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). “This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.”
 
 Anderson,
 
 470 U.S. at 573, 105 S.Ct. at 1511.
 

 The above standard, however, applies only to factual findings.
 
 Pullman-Standard v. Swint,
 
 456 U.S. 273, 287-88, 102 S.Ct. 1781, 1789-90, 72 L.Ed.2d 66 (1982). Where legal conclusions are involved, this court engages in
 
 de novo
 
 review.
 
 Id.
 

 
 *849
 
 c.
 

 In our view, the decision of the district court in the present case must be reversed as clearly erroneous. Under the facts and circumstances surrounding the receipt by Connelly of assets as fees, we find that there is but one “permissible view[] of the evidence....”; that Connelly was under a duty of inquiry as to the source of his fee, and this his inquiry would have clearly revealed that his fee was derived from fraudulently obtained assets.
 
 Anderson,
 
 470 U.S. at 574, 105 S.Ct. at 154.
 

 As to the insolvency standard applied by the magistrate, the Trustee argues that the proper approach is a “nature-of-the-property” standard rather than an insolvency standard. The Trustee asserts that the very nature and character of the property received by Connelly put him on notice. Therefore, Connelly cannot claim bona fide purchaser status even though he believed Mr. Wolfram solvent. We think this is a correct statement of the law in Ohio; for if the totality of the circumstances surrounding the conveyance of the assets given to Connelly aroused suspicion, Connelly should have inquired as to the source of the property he received.
 
 See Lewis v. Akerberg,
 
 100 Ohio App. 209, 218, 136 N.E. 2d 372, 379 (1954) (“If a purchaser ... is cognizant of facts sufficient to put him on inquiry, he cannot claim to be a bona fide purchaser for value without notice.”).
 

 The
 
 Restatement of Restitution
 
 § 174 states that “a person has notice of facts giving rise to a constructive trust if he knows the facts or should know them.” Comment a to this section provides:
 

 A person has notice of facts giving rise to a constructive trust not only when he knows them, but also when he should know them; that is when he knows facts which would lead a reasonably intelligent and diligent person to inquire whether there are circumstances which would give rise to a constructive trust, and if such inquiry when pursued with reasonable intelligence and diligence would give him knowledge or reason to know of such circumstances.
 

 Restatement of Restitution
 
 § 174 Comment a;
 
 see also
 
 Ohio Jur.3d,
 
 Notice
 
 § 18 (1987) (footnotes omitted) (“It is generally true that anything which naturally arouses suspicion as to the invasion of the rights of another should cause inquiry so as to charge the party with notice of the facts which a proper inquiry would disclose.”). Hence, while the insolvency of Mr. Wolfram is a legitimate factor to consider in determining whether Connelly’s suspicions should have been excited, we reject, on legal grounds, the magistrate’s view that “[ajwareness of a possible shortfall, was ... the sine qua non of any duty of inquiry on Mr. Connelly’s part.” J.A. at 87.
 

 Yet, as we noted above, the magistrate also found that all the facts surrounding Connelly’s payment, taken together, did not raise a duty to inquire. Even given the deference required by Rule 52(a), we cannot accept this view of the facts. Perusal of the nature of the property taken by Connelly in payment and the circumstances of the transfer of assets make it readily apparent that an attorney of reasonable prudence,
 
 see
 
 Bogert & Bogert,
 
 Trusts and Trustees
 
 § 894 (2d Ed. 1982), would have inquired as to the source of his fee.
 

 In our view, the facts can lead to only one conclusion;
 
 viz.,
 
 the circumstances surrounding the payment of Connelly’s fee and the property with which he was paid should have excited suspicion in Connelly so that he was under a duty of inquiry to determine the source of his fee. As the Trustee noted:
 

 [O]ne day after hearing Wolfram describe how he had used Toto, Ltd. stock to perpetuate a multi-million dollar fraud on Bell & Beckwith, Connelly took Toto, Ltd. stock as collateral for his fee. One day after he had heard Wolfram describe using a TZ Land and Cattle Co. account to transfer stolen money to Wolfram’s cattle ranches, Connelly took TZ Land and Cattle Co. stock. One day after Con-nelly heard Wolfram testify to loaning over one-quarter of a million dollars to Liberty Airlines, Connelly took Liberty Airlines stock. One day after Connelly heard Wolfram describe how he had used
 
 *850
 
 stolen money to purchase race horses and the Landmark Hotel, Connelly took Landmark jewelry and horse-related jewelry.
 

 Brief for Appellant at 21-22.
 

 It should be noted that, "a person cannot shut his eyes or ears to avoid information and then say he had no notice or knowledge." Ohio Jur.3d, Notice § 15, at 331. We hold that the conclusion is inescapable that facts existed which would have excited the suspicion of a reasonably prudent and diligent person. Hence, the only question remaining is whether the proper remedy is a remand of this action or the requiring of entry of judgment in plaintiff's favor. The Trustee argues that it is a principle of equity that where a person has a duty of inquiry and fails to inquire he should be deemed as having the knowledge which such inquiry would have disclosed. Although we have found no Ohio cases directly on point, we agree that general principles of equity require judgment be entered in plaintiff's favor.
 

 As a general rule, "where there are facts imposing a duty to inquire, [that] would not have disclosed the existence of an equity, the purchaser is not charged with notice of it." Bogert & Bogert, Trusts and Trustees § 894, at 237. Nonetheless, where a duty to inquire exists, a person "will be charged with knowledge of the facts concerning the equity which a reasonable investigation would have brought to light." Id. at 235. In the present case, it appears that reasonable investigation would have disclosed that the funds with which Connelly was paid were the results of the fraud. Accordingly, Connelly is to be charged with such knowledge.
 

 III.
 

 In sum, we conclude that the facts of the present case could lead only to one conclusion: that Connelly was under a duty to inquire and such inquiry, if undertaken, would have disclosed that his fee was paid with funds obtained through fraud. Accordingly, for the reasons stated, we REVERSE the judgment of the district court and REMAND the case with instructions to enter judgment in favor of plaintiff.
 

 [1]
 

 . The action was brought against Connelly and a second attorney, Frank McManus. On the eve of trial, however, McManus became ill, and the district court severed the action. The Trustee then proceeded against Connelly.
 

 [2]
 

 . At the time Connelly was retained, no charges had yet been brought against Mr. Wolfram. Connelly’s primary duty was to negotiate with the prosecutors investigating Mr. Wolfram's case.
 

 [3]
 

 . The parties have stipulated that a small part of the assets transferred to Connelly, approximately $9,000.00 worth, were acquired
 
 prior
 
 to commencement of Mr. Wolfram’s fraud. Thus, the Trustee makes no claim as to such property or proceeds from its sale. J.A. at 62-63. The assets which were not remitted to the Trustee were delivered by Connelly to Kidder Peabody & Co. and sold on his behalf.
 

 [4]
 

 .Because we find that the Trustee’s claims to Connelly’s fees succeeds under the Ohio law of constructive trusts, we do not reach the Trustee’s argument under 11 U.S.C. § 548. We agree, however, with Connelly that Ohio law governs the constructive trust issue as this presents a pendent state claim.
 
 United Mine Workers v.
 
 
 *846
 

 Gibbs,
 
 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).
 

 [5]
 

 . The magistrate in the present case entered judgment under 28 U.S.C. § 636(c)(1), which allows a magistrate designated by the district court to enter judgment in a case upon the consent of the parties.
 
 See generally Trufant v. Autocon, Inc.,
 
 729 F.2d 308 (5th Cir.1984). In such a case, appeal to this court is "in the same manner as an appeal from any other judgment of the district court.” 28 U.S.C. § 636(c)(3).