**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**May 19, 2005**

Charles R. Fulbruge III
Clerk

REVISED JULY 15, 2005
IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 03-51461

FEDERAL TRADE COMMISSION

Plaintiff - Appellee

v.

ASSAIL, INC; ET AL

Defendants

ROBERT M DRASKOVICH

Appellant

v.

ROBB EVANS & ASSOCIATES, LLC

Appellee

No. 03-51462

FEDERAL TRADE COMMISSION

Plaintiff - Appellee

v.

ASSAIL, INC; ET AL

Defendants

DEAN Y KAJIOKA

Appellant

v.

ROBB EVANS & ASSOCIATES, LLC

- 1 -

Appellee

Before KING, Chief Judge, and GARZA and BENAVIDES, Circuit
Judges.

KING, Chief Judge:

This consolidated appeal concerns the district court's
refusal to award attorney's fees to two attorneys whose clients
had their assets frozen as part of a civil case brought by the
Federal Trade Commission. After the district court entered an
asset freeze order, the two clients paid substantial retainers to
their attorneys. In separate orders, the district court ordered
the attorneys to turn all or substantially all the funds over to
the court-appointed receiver. The attorneys now appeal those
orders. We AFFIRM.

## I. BACKGROUND

### A. Common Factual Background

The events leading to these two appeals can be traced to
January 9, 2003, when Plaintiff-Appellee Federal Trade Commission
("FTC") filed a complaint in the United States District Court for
the Western District of Texas. The complaint alleged that a
variety of corporations and individuals, led by Kyle Kimoto and
his primary operating company, Assail Inc. ("Assail")
(collectively the "defendants"), engaged in a telemarketing
scheme in violation of § 5(a) of the Federal Trade Commission Act

- 3 -

("FTCA"), 15 U.S.C. § 45(a), and the FTC's Telemarketing Sales Rule, 16 C.F.R. § 310.1-.9.[1]

At the FTC's insistence, on the day the complaint was filed, the court issued an ex parte temporary restraining order barring the defendants from continuing their scheme and freezing their assets. The order named certain specific defendants, but it also made clear that the "provisions of this Order shall be binding upon the defendants and upon their . . . attorneys . . . and all other persons or entities in active concert or participation with [the defendants] who receive actual notice of this Order . . . ." The court also appointed Appellee Robb Evans & Associates, LLC ("REA") as receiver. On February 4, 2003, the district court issued a preliminary injunction that essentially restated the terms of the temporary restraining order.

B. **Factual and Procedural Background for Robert M. Draskovich**

On January 15, 2003, REA took control of Assail's principal

---

[1] The defendants told consumers that in exchange for an advance fee, they would receive a pre-approved MasterCard credit card. As part of the verification process, the defendants also offered consumers "free trials" of various services without indicating that acceptance of the trials would result in recurring monthly charges to the consumers' bank accounts. Using information obtained through these misrepresentations, the defendants debited each consumer's account $175 or more.

The consumers never received the benefits they were promised. Rather than receiving a credit card, consumers generally received either an application for a cash-secured debit card or an unusable plastic card with an unauthorized reproduction of the MasterCard logo and meaningless numbers embossed on the card. The defendants also made it extremely difficult for consumers to cancel recurring charges and obtain refunds.

place of business in St. George, Utah. The next day, Kimoto retained Appellant Robert M. Draskovich to defend him in the FTC's matter and in any potential criminal matters. The day after that, January 17, Draskovich received a $200,000 retainer. The funds were wired directly to him by Alliance Solutions, Inc. ("Alliance"). On January 21, 2003, Draskovich received an additional $10,000, which was transferred to him from Valdine Management Co. ("Valdine"). Kimoto assured Draskovich that the Alliance funds were not "tainted," i.e., the funds had nothing to do with the government's allegations of telemarketing fraud.

On September 22, 2003, Kimoto, Assail, and the FTC entered into a stipulated judgment which brought the proceedings against Kimoto and Assail to a close. The court issued a judgment against Kimoto for $106 million. The judgment was suspended to the extent that it exceeded the sum generated from the liquidation of the assets in which Kimoto had an interest. All funds generated from the liquidation were ordered to be paid as consumer redress. The stipulated judgment contained a provision that allowed the defendants' attorneys to apply for fees from the receivership estate. On October 2, 2003, Draskovich applied to the district court to allow him to retain the funds he received from Alliance and Valdine. This was in spite of the fact that in April 2003, the FTC had already requested that Draskovich return the $210,000, arguing that the funds were transferred to him in violation of the court's asset freeze order. On October 22,

- 5 -

2003, the FTC and REA filed motions opposing the fee application and requesting that the district court require Draskovich to turn over the $210,000 to REA. On November 13, 2003, the court denied Draskovich's application and granted the FTC and REA's counter-motions requesting repayment of the entire retainer. Draskovich now appeals from the court's November 13 order. On appeal, he argues that: (1) the district court erred in finding that the fees he received were subject to the initial asset freeze; (2) the district court's order violated his client's Sixth Amendment right to counsel; and (3) the procedures the district court used in making its decision violated due process.

## C.  Factual and Procedural Background for Dean Y. Kajioka

When REA staff took control of Assail on January 15, 2003, an Assail employee mentioned that Assail was in the process of installing certain joint equipment with Valdine. Valdine was located in the same office complex as Assail. This led REA staff to suspect that even though Valdine was not named in the FTC's complaint, it was part of Kimoto's scheme. REA's suspicions were confirmed when it visited Valdine's offices that same day. REA found Woody Davidson, Assail's head of technology, in the process of installing $100,000 worth of equipment to create a telemarketing call center, as well as linking Valdine and Assail's computer and telephone systems so that they would be fully integrated. Davidson and other Assail employees indicated that Valdine's offices were to become the control center for

Assail's telemarketing operations.

Steven Henriksen, Valdine's president, secretary, treasurer, sole shareholder, sole employee, and sole bank account signatory, was quickly informed of REA's actions by his brother, who was the Chief Financial Officer of Assail and a defendant in the underlying action. In the two weeks following REA's raid, Henriksen, at the direction of Kimoto, paid out approximately $500,000 from Valdine's accounts to secure legal representation for the various defendants.[2] During this general time period, Henriksen also paid himself approximately $130,000 in bonuses.

On January 20, 2003, Henriksen retained Appellant Dean Y. Kajioka to represent him and Valdine for an initial retainer of $60,000. The next day, Henriksen withdrew $10,000 from Valdine's account to pay part of Kajioka's retainer. The day after that, January 22, Henriksen withdrew another $50,000 to pay the remainder of the retainer.

On January 23, 2003, Kajioka called REA and objected to REA's taking possession and control of Valdine, taking particular note of the fact that Valdine was not named in any court papers. REA informed Kajioka that it believed Valdine was an affiliated entity of Assail, and thus REA would not release Valdine's assets. Kajioka's claim that Valdine was not named in any court papers was mooted as a result of the court's preliminary

---

[2] Draskovich's second payment of $10,000 came from this disbursal.

injunction on February 4. Unlike the initial temporary restraining order, Valdine was expressly included within the scope of the temporary injunction.

On June 2, 2003, REA's counsel sent a letter to Kajioka demanding that he return the full retainer to REA because the funds had been transferred in violation of the court's asset freeze order. Kajioka refused REA's request. This refusal prompted the FTC and REA to file separate motions on August 21, 2003, requesting the court to issue an order forcing Kajioka and Henriksen to show cause why they should not be held in contempt. On September 5, 2003, the court issued such an order.

On October 2, 2003, the district court held a hearing for Henriksen and Kajioka to show cause why they should not be held in contempt. Henriksen asserted his Fifth Amendment right as to all substantive questions. Kajioka refused to testify under oath, but he did make an unsworn statement in open court. He acknowledged that he had been retained to represent Henriksen on January 20, 2003 and had received the $60,000 retainer. He also stated that he was retained to represent Henriksen in any potential criminal actions but had also provided representation in the civil case.

On October 9, 2003, the court issued an order holding Henriksen in contempt for dissipating Valdine's assets in violation of the temporary restraining order and the preliminary injunction. The court declined to hold Kajioka in contempt. The

court found that because no criminal prosecution commenced, Kajioka could not have earned the entire $60,000 for services rendered in connection with Henriksen's potential criminal liability. The court did allow Kajioka to retain $10,000 for services rendered and ordered him to return the rest of the funds to REA or show cause why he should not be held in contempt. Kajioka filed several memoranda, as well as documentary evidence, with the court in support of his contention that he should be allowed to keep the full amount of the retainer. On November 26, 2003, the court issued its final order on the matter. The court reiterated its earlier determination that Kajioka was allowed to keep $10,000.[3] Kajioka now appeals from the court's final order, raising on appeal the identical issues as Draskovich.

## II. STANDARD OF REVIEW

This appeal essentially covers two issues: (1) the district court's orders concerning assets found to be part of the receivership estate; and (2) the district court's award of attorney's fees. Both issues are reviewed on an overall abuse of discretion standard, under which we review underlying factual findings for clear error and issues of law de novo. See United States v. Melrose E. Subdivision, 357 F.3d 493, 498 (5th Cir.

---

[3] The court, however, slightly modified the earlier order. At some point, Kajioka took $10,000 from the initial retainer and paid it to Marjorie Guymon, another attorney who did some work on Henriksen's case. Since Guymon had already turned over her $10,000 to REA, the court determined that Kajioka needed to repay only $40,000.

2004) (reviewing under an abuse of discretion standard a request to amend an asset freeze order in order to pay attorney's fees).

### III.  ANALYSIS

### A.  Appellate Jurisdiction

On April 15, 2004, we sent a briefing notice to the parties directing them to address the following issue: "Whether the order(s) from which appeal is taken in this civil case is appealable based on the termination of the litigation, pursuant to R. 54(b), Fed. R. App., or the collateral order doctrine, or whether there exists [sic] some other bases of appellate jurisdiction.  See generally 28 U.S.C. §§ 1291, 1292(a), (b)."

Upon reviewing both the parties' arguments and the record, we conclude that we do have jurisdiction to hear these appeals. The final section of the stipulated order entered into on September 22, 2003, states: "The parties hereby consent to entry of the foregoing Order which shall constitute a final judgment and order in this matter.  The parties further stipulate and agree that the entry of the foregoing order shall constitute a full, complete, and final settlement of this action."  This order was entered on September 22, 2003.  The order relating to Robert M. Draskovich was entered on November 13, 2003.  The order relating to Dean Y. Kajioka was entered on November 26, 2003. Thus, both orders were entered after the underlying litigation against Kimoto was settled.

With respect to Draskovich, this chronology makes it clear

that the underlying litigation is final.  The same holds true for Kajioka.  Kajioka's client, Steven Henriksen, never was a defendant in the underlying action.  However, the true ownership of the funds in his possession, including those he used to pay Kajioka, was a question to be determined in the underlying litigation.  That question was answered by the stipulated order. Thus, in both cases the district court entered a final judgment before Draskovich and Kajioka initiated their respective appeals. Essentially, the stipulated order terminated the liability phase of the case.  The instant appeals concern REA's efforts to reduce Kimoto's assets to liquid form and distribute those liquid assets to victims of his fraudulent scheme.  Accordingly, this court has appellate jurisdiction to hear these appeals.

**B.  The District Court did not Err in Finding that Draskovich and Kajioka Improperly Accepted and Maintained Possession of the Retainers**

Draskovich and Kajioka argue that their acceptance of the retainers was permissible because the funds they accepted were not subject to the initial asset freeze order.  Kajioka claims that at the time he was paid his retainer, Valdine and Henriksen had not been mentioned in any court papers.  Valdine and Henriksen were not specifically mentioned until the February 4 preliminary injunction was issued.  Until that time, Kajioka claims there was no way he could have known that Henriksen and Valdine were subject to the asset freeze order.  Kajioka further

asserts that in his January 23 call to REA, he was led to believe that the seizure may have been a mistake. Similarly, Draskovich claims that when he received the funds from Alliance and Valdine, they had not been named in any court papers. Thus, in the appellants' view, to say that the transfers violated a court order would be to say that the order was violated before it ever existed.

The appellants alternatively argue that there was no way for them to know that the transfers violated the court order. The appellants argue that their ignorance is a valid excuse because they had no duty to independently investigate whether the parties paying their fees were acting in concert with the named parties. To the extent there was such a duty to inquire, Draskovich argues that he fulfilled this duty by securing Kimoto's promise that the funds with which he was being paid were not tainted.

### 1. The Appellants' Fees Were Subject to the Asset Freeze Order

The appellants' arguments fail to persuade us that the district court erred. As mentioned above, the initial ex parte temporary restraining order stated that the terms of the order covered the named parties as well as "all other persons or entities in active concert or participation with" the defendants. The district court's determination that Alliance, Valdine, and Henriksen were acting in concert with the named defendants, and thus were subject to the asset freeze, is a finding of fact that

is reviewed for clear error.  Cf. Portland Feminist Women's Health Ctr. v. Advocates for Life, Inc., 877 F.2d 787, 789-90 (9th Cir. 1989) (holding that the court of appeals could not review whether the district court's determination that a contemptor was acting in concert with a party named in an injunction was clearly erroneous because the appellant-contemptor failed to provide the necessary hearing transcripts in the record).

The record provides substantial evidence supporting the district court's determination.  REA's investigation established that nearly all of the money flowing into and out of Alliance and Valdine's bank accounts came from, and was sent to, other Kimoto-controlled entities.  REA found no business justification for any of these transfers.  The incipient joint operation center is also highly relevant because it shows that Valdine and Assail were essentially operating as one company.  Thus, we affirm the district court's finding that the appellants' fees were paid with funds subject to the asset freeze order.

### 2.  The Appellants Had a Duty to Inquire As to the Source of Their Fees

The next question, then, is whether an attorney has a duty to inquire as to the source of his fee when he is put on notice that his fee may derive from a pool of frozen assets.  Although this court has yet to confront this issue directly, we hold that for several reasons an attorney does hold such a duty.  First, we

think that accepting a fee from a pool of assets frozen by a court order is sufficiently akin to accepting a fee from the proceeds of criminal activity to make the principle applicable to the latter situation instructive here. As a general matter of professional ethics, an attorney "may not accept the fruits of the crime as a fee, for knowingly accepting the fruits of crime in return for valuable services is simply a form of aiding and abetting crime . . . ." 1 GEOFFREY C. HAZARD, JR. & W. WILLIAM HODES, THE LAW OF LAWYERING § 9.32, at 9-136 (3d ed. Supp. 2005). For this reason, an attorney must "'audit' a client sufficiently so as to avoid becoming part of a criminal scheme that includes disposing of ill-gotten gains." Id. The instant case did not involve criminal charges, although it bears mentioning that both lawyers were retained for potential criminal representation. Even though criminal charges apparently did not materialize, it is clear that Kimoto committed multiple, egregious violations of the FTCA. Further, the fees in question were derived from Kimoto's fraudulent scheme. Thus, it seems entirely appropriate to apply to the instant case this general ethical obligation to "audit" a client before accepting potentially tainted fees.

Additionally, "[t]his court adheres to the well established doctrine that [a]n attorney, after being admitted to practice, becomes an officer of the court, exercising a privilege or franchise. As officers of the court, attorneys owe a duty to the court that far exceeds that of lay citizens." Carroll v. Jaques

Admiralty Law Firm, P.C., 110 F.3d 290, 294 (5th Cir. 1997) (internal citations and quotation marks omitted) (second alteration in original). For us to hold that an attorney has no duty to investigate the source of his fees in the instant circumstances would essentially be a statement that an officer of the court has no duty to investigate whether he himself is violating a valid court order. We are not willing so to hold.

In rather similar circumstances to the instant case, the Ninth Circuit followed this officer-of-the-court rationale in holding that an attorney did have a duty of inquiry. CFTC v. Co Petro Marketing Group, Inc., 700 F.2d 1279 (9th Cir. 1983). In Co Petro, the district court appointed a receiver over a firm and permanently enjoined it from transferring or diverting any of its resources. The next day, the firm sent a $60,000 check to its law firm to cover its existing legal bill and to establish a trust account for future services. The law firm cashed the check before it received a copy of the district court's order. The receiver later petitioned the district court to force the law firm to return the funds. The district court granted the petition. On appeal, the Ninth Circuit affirmed the district court's order, noting that:

> [a]s an officer of the court, appellant was under a duty to inquire as to the exact terms of the district court's decision [to freeze his client's assets] before depositing the check. Consequently, we agree with the district court that [the appellant] violated the permanent injunction against transfer of [the frozen] assets when it

- 15 -

deposited the check.

Co Petro, 700 F.2d at 1285.

The Sixth Circuit's decision in McGraw v. Connelly (In re Bell & Beckwith), 838 F.2d 844 (6th Cir. 1988), provides yet another rationale for imposing a duty of inquiry on attorneys. In McGraw, a bankruptcy trustee sought to recover $150,000 of a bankrupt firm's assets that were paid to an attorney to represent the firm's managing director in a criminal case. At the time the fee was paid, the firm had been placed into receivership and all of its assets had been frozen. The attorney acknowledged that the funds were fraudulently conveyed and that he held them pursuant to a constructive trust. However, he argued that he received the funds as a bona fide purchaser for value, and thus his rights to the funds were superior to the trustee's. The Sixth Circuit disagreed with this claim, finding that a party cannot be a bona fide purchaser where the circumstances surrounding the conveyance would lead a reasonable person to doubt the validity of the transfer. Id. at 849. Where such reasonable doubt exists, the court found that a party has a duty to make further inquiry. The court summarized its conclusion by stating that the attorney "was under a duty of inquiry as to the source of his fee, and this [sic] his inquiry would have clearly revealed that his fee was derived from fraudulently obtained assets." Id.

Finally, the asset forfeiture provisions in the Racketeer

- 16 -

Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1963 (2000), and the Continuing Criminal Enterprise Statute ("CCE"), 21 U.S.C. § 853 (2000), while not applicable here, are nonetheless instructive. Under both statutes, property (including money) derived from criminal activity is subject to forfeiture irrespective of whether the criminal defendant still possesses the property. 18 U.S.C. § 1963(c) (2000); 21 U.S.C. § 853(c) (2000). However, the statutes also provide that a third-party transferee may defeat forfeiture if "the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section . . . ." 18 U.S.C. § 1963(l)(6)(B) (2000); 21 U.S.C. § 853(n)(6)(B) (2000). Based on this statutory language, it stands to reason that if an attorney has been paid with funds tainted under either RICO or the CCE and wishes to retain them, he must demonstrate that he conducted an inquiry sufficient to allow him to be "reasonably without cause to believe that the property was subject to forfeiture." In In re Moffitt, Zwerling & Kemler, P.C., 846 F. Supp. 463 (E.D. Va. 1994), the court took exactly this approach. In Moffitt, a law firm was retained by a client who was indicted under the CCE for the sale of narcotics. The client paid the firm's $103,800 retainer in cash using primarily $100 bills he kept stored in a cracker box. Aside from admonishing the client

that the law firm could not accept "funny money," the firm made no efforts to ascertain the source of the funds. When the government sought forfeiture of the funds, the firm claimed that it was protected under § 853(n)(6)(B). The court rejected this claim, stating:

> when confronted with circumstances essentially similar to those at bar attorneys should inform prospective clients that they cannot pay fees with drug proceeds and that such proceeds are subject to forfeiture, even in the attorney's hands. If the prospective client answers that the money comes from legitimate sources, attorneys should take whatever further steps or ask whatever further questions may be suggested by the circumstances to satisfy themselves that it is objectively reasonable to believe the answer.

Id. at 474. The Fourth Circuit affirmed this approach, stating: "We can find no fault with the district court's conclusion." United States v. Moffitt, Zwerling & Kemler, P.C., 83 F.3d 660, 665 (4th Cir. 1996).

Based on the above cases and commentary, there is a clear principle that an attorney is not permitted to be willfully ignorant of how his representation is funded. While each case is distinguishable from the instant case in some way, when taken together, they teach that when an attorney is objectively on notice that his fees may derive from a pool of frozen assets, he has a duty to make a good faith inquiry into the source of those fees. Failure to make such an inquiry in the face of this duty will result in disgorgement of the funds.

- 18 -

### 3.   The Appellants Did Not Discharge their Duty of Inquiry

The final query is whether the appellants received sufficient notice to trigger this duty of inquiry and whether they discharged the duty.  The circumstances of Draskovich's fee payment should have alerted him that something was awry.  He knew that his client was accused of perpetrating massive telemarketing fraud, that all of his assets were frozen, and that supposedly unrelated third parties were paying his fees.  These facts should have raised Draskovich's suspicions.  Indeed, in the context of RICO and the CCE, the Supreme Court has stated that the mere fact that an attorney has read the indictment against his client is enough to put him on notice that his fees are potentially tainted and to destroy his status as a bona fide purchaser for value. Caplin & Drysdale v. United States, 491 U.S. 617, 633 n.10 (1989) ("given the requirement that any assets which the Government wishes to have forfeited must be specified in the indictment, the only way a lawyer could be a beneficiary of § 853(n)(6)(B) would be to fail to read the indictment of his client") (internal citations omitted); United States v. Monsanto, 491 U.S. 600, 604 n.3 (1989) ("An attorney seeking a payment of fees from forfeited assets under § 853(n)(6) would presumably rest his petition on subsection (B) quoted above, though (for reasons we explain in Caplin & Drysdale . . .) it is highly doubtful that one who defends a client in a criminal case that results in forfeiture could prove that he was without cause to believe that the

- 19 -

property was subject to forfeiture.") (internal citations and quotation marks omitted). Once on notice, Draskovich needed to do far more than simply take his client at his word that the fees were not tainted in order to make a reasonable claim for fees. Trusting Kimoto's truthfulness unconditionally was especially unreasonable considering that he was accused of fraud, an allegation going directly to his honesty.

Kajioka may not be quite as culpable as Draskovich, which may account for the district court's decision to allow Kajioka to keep some of the fees paid to him. According to Kajioka, his client initially assured him that REA had made some mistake in seizing his office. The record suggests that REA apparently did make a few such mistakes when it initially raided Assail's offices, so Kajioka may not have been patently unreasonable in initially taking his client at his word. However, during Kajioka's January 23, 2003 call with REA, he was given information that put him on notice that REA probably did not simply knock on the wrong door. This notice triggered a duty of inquiry, which Kajioka did not discharge. Any claim he may have for work completed before the January 23 call with REA is accounted for by the $10,000 the district court awarded him. Kajioka does not argue that this fee award was inappropriate for the several day's worth of services he then provided.

Thus, the district court properly concluded both that Draskovich and Kajioka improperly accepted their retainers and

that they should turn over all (or substantially all, in the case of Kajioka) the retainers to REA for distribution to the victims of Kimoto's fraudulent scheme.

**C.    The District Court's Orders did not Violate the Sixth Amendment**

Draskovich and Kajioka argue that the district court's orders violate their respective clients' Sixth Amendment rights because the orders deny the clients representation by counsel of their choice.  In the appellants' view, this Sixth Amendment interest must trump the FTC's interest in obtaining restitution.

The appellants' Sixth Amendment argument is totally without merit.  The most important reason the argument fails is that this is a civil case.  The Sixth Amendment right to counsel is inapplicable in civil cases.  See Goonsuwan v. Ashcroft, 252 F.3d 383, 385 n.2 (5th Cir. 2001) ("It is well settled that, because deportation hearings are considered civil in nature, there is no Sixth Amendment right to counsel."); Sanchez v. United States Postal Serv., 785 F.2d 1236, 1237 (5th Cir. 1986) (per curiam) ("[T]he sixth amendment right to effective assistance of counsel does not apply to civil proceedings.").

**D.    The District Court Afforded Draskovich and Kajioka Due Process**

Draskovich and Kajioka claim that their due process rights were violated because in rendering its decisions, the district court relied solely on affidavits and self-serving reports from REA.  They claim that where a contemptor asserts genuine issues

of material fact, it is inappropriate for a court to issue contempt sanctions without a full, impartial hearing.  The appellants assert that there were several disputed issues of fact at the relevant district court hearings.  They claim that in the face of these disputed issues, they were provided with only a summary proceeding in which they did not have the opportunity to face their accusers, hear the basis of their accusers' conclusions, cross-examine them, or call witnesses.

As with the appellants' Sixth Amendment argument, this due process argument is without merit.  The appellants' attempt to characterize themselves as contemptors must fail for the simple reason that they were never held in contempt.  This is an appeal regarding disputes between a receiver and two nonparties to the underlying case.  The court resolved the dispute and backed up its resolution with the threat of contempt.  Every court order is backed with the implicit threat of contempt if the order is violated.  See United States v. Fidanian, 465 F.2d 755, 757 (5th Cir. 1972) ("It is settled law that the power to punish for contempt is an inherent power of the federal courts and that it includes the power to punish violations of their own orders."). In this case, the threat was merely made explicit.  Thus, the contempt issue is simply a red herring.

Although this court has not confronted directly the issue of what process is due where a receiver and a nonparty both claim the same property, the Ninth Circuit has stated clearly that in

such circumstances "summary proceedings satisfy due process so long as there is adequate notice and opportunity to be heard." Commodities Futures Trading Comm'n v. Topworth Int'l, Ltd., 205 F.3d 1107, 1113 (9th Cir. 2000).  It is wrong for the appellants to claim that they did not have an opportunity to respond to the claim that they did not rightfully possess the funds in question. In Kajioka's case, on October 2, 2003, the court held a hearing on the issue of whether the funds were transferred in violation of the asset freeze order.  Kajioka was present at the hearing and refused the offer to cross-examine the witnesses.  The fact that this hearing occurred negates Kajioka's contention that the district court relied exclusively on documentary evidence in reaching its determination.  After this hearing, the court also permitted Kajioka to submit two legal memoranda briefing the relevant legal issues as well as documentary evidence. Draskovich also had an opportunity to respond.  On October 2 and 30, 2003, Draskovich submitted to the court memoranda and supporting documentary evidence arguing for his position. Because the appellants actually did make the effort to respond to the charges against them, they clearly had notice of the claims. In Draskovich's case, the notion that he did not have notice is particularly fantastic because he took part in negotiating the stipulated judgment that set out the procedures by which he petitioned the court to keep his retainer.

## IV.  CONCLUSION

- 23 -

For the foregoing reasons, the orders appealed from are AFFIRMED.