# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FEDERAL TRADE COMMISSION,
          *Plaintiff-Appellee,*

v.

NETWORK SERVICES DEPOT, INC.;
NETWORK MARKETING LLC;
NETWORK SERVICES DISTRIBUTION,
INC.; CHARLES V. CASTRO;
ELIZABETH L. CASTRO; GREGORY
HIGH; SUNBELT MARKETING, INC.,
          *Defendants-Appellants,*

and

PHYLLIS WATSON,
          *Relief Defendant.*

No. 09-15684

D.C. No.
2:05-cv-00440-
LDG-LRL

OPINION

Appeal from the United States District Court
for the District of Nevada
Lloyd D. George, Senior District Judge, Presiding

Argued and Submitted
June 15, 2010—San Francisco, California

Filed August 16, 2010

Before: Pamela Ann Rymer and Raymond C. Fisher,
Circuit Judges, and Rebecca R. Pallmeyer,
District Judge.*

Opinion by Judge Pallmeyer

---

*The Honorable Rebecca R. Pallmeyer, United States District Judge for
the Northern District of Illinois, sitting by designation.

11671

## COUNSEL

Jeffrey S. Benice, Costa Mesa, California, for the defendants-appellants.

Willard K. Tom, John F. Daly, and Mark S. Hegedus (argued), Federal Trade Commission, Washington, D.C., Lisa D. Rosenthal, Kerry O'Brien, Federal Trade Commission, San Francisco, California, for the plaintiff-appellee.

## OPINION

PALLMEYER, District Judge:

### *OVERVIEW*

Appellants are a group of related companies and their principals, engaged in the business of marketing and selling internet kiosk investment opportunities. On summary judgment, the district court found Appellants civilly liable for making material misrepresentations and engaging in deceptive business practices in violation of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and the FTC's Franchise Rule, 16 C.F.R. § 436 (2005). As a remedy, the district court imposed liability for equitable monetary relief upon the companies, their owner, and one of their senior officers. Because the court determined that fees for Appellants' attorney were paid from funds derived from the unlawful activities, the court also imposed a constructive trust over a portion of those fees. On appeal, Appellants contend that the district court erred in imposing a constructive trust upon their attorneys' fees and assert that unresolved issues of fact with regard to Appellants' mental states precluded summary judgment. For the reasons explained below, we affirm the district court's decision in its entirety.

### *BACKGROUND*

### I.   The Sham "Business Opportunity"

From 2001 to 2004, Appellant Network Services Depot, Inc. ("NSD"), its owner Charles Castro, and its senior executive Gregory High were in the business of selling internet kiosk business opportunities. In theory, the internet kiosks were to be stand-alone computer terminals, placed in public spaces such as airports or hotel lobbies, at which a user could log onto the internet for a fee charged to the user's credit card. NSD sold the opportunities to investors for amounts ranging

from $4,400 to $7,000 per kiosk. In return, the company promised that it would secure locations and arrange for installation and activation of fully functional kiosk terminals. NSD issued each customer who purchased a kiosk opportunity a bill of sale and a letter transferring NSD's rights, title, and interest in a specific kiosk to the customer. Ostensibly, the revenues thereafter generated by the kiosk would be paid to the customer under a quasi-franchise arrangement. In its sales pitch to prospective customers, NSD represented that the internet kiosks would generate substantial revenue. "Well placed devices will generate $1,000 per day," boasted one NSD PowerPoint presentation. NSD also provided customers with a disclosure agreement circular, which contained the following statements:

> We will sell you one or more publicly-accessible Internet access terminal Businesses, fully installed at a specific location selected by you from among available Sites we have identified . . . or at a Site which you own or lease or have secured yourself . . . .

> Once you notify us of the Site you have chosen . . . , we will . . . install an Internet Access terminal at that Site, and sell to you that Business and assign the Site Agreement to you, if applicable . . . [and]

> Since you are purchasing one or more fully-operational Business(es), you will begin operation of your Business(es) immediately upon the Closing, which barring unforeseen circumstances will occur no later than 60 days after the Effective Date of your Sales Agreement, or 30 days after you have submitted a Site Acceptance Notice for each Business, whichever is later.

In late 2001, NSD and Castro entered into a working relationship with Ed Bevilacqua and his internet kiosk companies

—Bikini Vending Corp., MyMart, Inc., and 360 Wireless Corp. (collectively referred to as "BVC")—whereby Bevilacqua and BVC agreed to supply and install the kiosks on NSD's behalf at locations that BVC identified and obtained. In exchange, NSD agreed to pay BVC a share of the proceeds generated from its ongoing efforts in promoting and selling the business opportunities to the public. Although it had delegated the task of securing locations and installing kiosks to BVC, NSD remained exclusively contractually obligated to its customers to place and install the kiosks.

In most instances, BVC also served as a third-party manager for NSD's customers, ostensibly operating and overseeing purchased kiosk sites on the customers' behalf. As part of its management agreement, BVC guaranteed that NSD's customers would receive a set minimum revenue payment each month. NSD promoted BVC's management abilities and the revenue guarantee in its sales and marketing materials, and BVC's representations ultimately became an integral NSD selling point. As Castro later explained: "I would like to be able to say that I was successful with [NSD] because of my charm and business savvy, et cetera. That's not why we were successful. We were successful because of Ed [Bevilacqua]. . . . [T]he reality of it was the folks that bought from [NSD] were buying from Ed." Castro and Bevilacqua were in frequent communication, and the two men occasionally appeared together to promote the kiosk program in joint presentations. Appellant Gregory High also regularly communicated with Bevilacqua and other BVC agents and performed official acts, such as signing documents, on BVC's behalf in the regular course of his duties at NSD.

By most outward appearances, the partnership between NSD and BVC was a fruitful one. In 2003, BVC represented that it had already installed thousands of operational kiosk terminals, and NSD disseminated projections that claimed the average monthly revenue for such terminals exceeded $1,100 per machine per month. While there is no evidence that any

NSD customer ever saw returns approaching those projections, BVC did send NSD's customers the guaranteed "minimum revenue payment" every month, as promised. NSD also continued to promise customers exponential growth in the internet kiosk market. Both NSD and BVC publicly stated that their goal was to install and sell 250,000 kiosk locations nationwide by 2006. Based largely on NSD's growth and revenue forecasts, more than 800 consumers purchased or traded other assets in exchange for thousands of NSD kiosk business opportunities by early 2004. According to a Federal Trade Commission ("FTC") analysis of Appellants' financial records, consumers paid NSD and its affiliates more than $18 million for participation in the kiosk program.

In reality, however, the vast majority of the kiosk opportunities that NSD sold to the public simply did not exist. Only 270 kiosks were ever actually manufactured and installed, and, of those, fewer than 160 ever had operational connections to the internet. As these numbers reveal, almost all of the thousands of business opportunities that NSD marketed and sold to the public were, in fact, a sham. According to BVC's former Chief Financial Officer Alejandro Tanabe, the minimum monthly payments that BVC sent to kiosk customers came primarily from money that the company received from NSD as new customers signed up for the program. "There was no other significant source of revenue," Tanabe testified, because all of the functioning kiosks combined generated less than $2,000 per month. Over the course of his tenure, Tanabe also discovered accounting irregularities at BVC that suggested Bevilacqua had diverted millions of dollars in revenue for his personal use.[1] The FTC now describes the operation as "a classic Ponzi scheme."

The scheme began to unravel in February 2004, when a

---

[1]Bevilacqua and BVC are not parties to this action; the FTC reports it has pursued or intends to pursue its claims against Bevilacqua and BVC in separate proceedings.

California-based television news affiliate aired an investigative report exposing BVC's questionable business practices. In March 2004, Tanabe and other BVC employees came forward and confirmed that BVC had been perpetrating its fraudulent activities by funding payment obligations with money diverted from new investors. Appellants concede that the actions and representations made by BVC and Bevilacqua were fraudulent and misleading, and they do not dispute that the scheme resulted in millions of dollars in losses to NSD's customers. Appellants contend, however, that neither Castro nor High personally had any advance knowledge of the fraudulent scheme. Indeed, Appellants claim, NSD itself was the primary victim of Bevilacqua's fraud. According to Appellants, Bevilacqua deliberately concealed the full scope of the fraud in order to obtain payments totaling more than $10.5 million from NSD for the installation of kiosks that never existed.

In an affidavit produced in opposition to summary judgment, Castro stated that he first became aware of the fraudulent scheme in March 2004 when BVC's practices were unmasked by Tanabe. Castro then contacted the Federal Bureau of Investigation at the suggestion of an attorney. In cooperation with the FBI, Castro had five secretly recorded conversations with Bevilacqua between March 10 and March 12, 2004.[2] According to Castro, during these conversations, Bevilacqua "continued to perpetrate his fraudulent scheme."

The blanket denial in Castro's affidavit is at odds, however, with the deposition testimony that he gave earlier in the case. While Castro consistently disavowed all actual knowledge of fraud in that testimony, he acknowledged several incidents over the course of his relationship with Bevilacqua that were early indications of BVC's malfeasance. Castro and Bevilacqua had worked closely together to develop their mutual business interests after first meeting in 2001. "I thought he was a

---

[2]The record does not contain tapes or transcripts of these conversations.

guy that understood the business," Castro testified. "[He] did not strike me as the kind of guy that would ever do what he did." As time went on, however, Castro began to suspect that Bevilacqua might prove incapable of delivering on some of the grand promises he was making to NSD's customers: "[W]hen Ed would articulate to a group of people, a room full of people, with myself being present . . . and he would say [he could install] 20,000 machines in two and a half years, it made me want to choke. . . ." After one meeting in December 2003, when Bevilacqua made another grandiose projection to a group of NSD sales agents, Castro confronted Bevilacqua privately with his concerns: "I sat with Ed," Castro testified, "and [I] said, 'Ed, you, kind of, told the agents you had the capacity to do this [installation of 1,000 new machines per month]. Do you have the capacity to do this?' It was at that time he disclosed to me that he was about 300 [machines] behind [the number of existing orders] and that he had $2 million in the bank." At no point, however, did Castro ever publicly contradict or question the representations that Bevilacqua was making to NSD's customers or agents.

Also in late 2003, NSD began receiving reports from a number of customers who had visited the supposed sites of their kiosks only to find nothing there. Other customers reported that, while they knew their machines had not yet been installed, they had inexplicably begun to receive "minimum revenue payments" purportedly generated by the non-functional kiosks. Castro received many of these reports personally.[3] For example, Castro received an e-mail from one such customer, which made the following prescient observation:

> I have been receiving my revenue payments as

---

[3]High also estimated that he had personally received over 30 customer complaints about nonexistent kiosks, but he stated that his usual practice was to simply refer complaining customers directly to BVC to "let them work it out."

> promised. I am deeply concerned, however, where
> my revenue payments are coming from. My
> machines are certainly not producing enough reve-
> nue to pay me the minimum amounts. . . . Where is
> the extra money coming from to allow BVC to make
> its required minimum monthly payments and more
> importantly, how long can this trend continue before
> BVC is in serious financial trouble?

Though Appellants now argue that such complaints were too isolated or insignificant to put Castro on notice that something was seriously amiss with BVC's practices, the undisputed evidence confirms that Castro was in fact increasingly concerned by the numerous complaints. In December 2003, Castro sent Bevilacqua an e-mail, saying: "As I'm sure you are aware, this is rapidly becoming a huge issue. Clients and agents are driving out to the sites to find no kiosks installed." In his reply message, Bevilacqua responded to this "huge issue" by asking Castro to direct that High compile a list of the complaining customers and the sites visited "so we can get them moved up in the list." High admitted that, around this same time, he began assigning new customers to kiosk sites that were, in his words, "not too close to where the client and agent live[d]" in order to make it more difficult for customers to physically inspect kiosk locations. In this way, NSD was complicit in disguising the delays plaguing the installation process. Nevertheless, neither Castro, High, nor any other NSD agent ever disclosed such problems to the public or attempted to decelerate efforts to promote and sell the business opportunities to new customers.

Castro acknowledged that NSD had a "responsibility" to respond to the consumer complaints, but he admitted that neither he nor High ever sought to investigate complaints by regularly visiting kiosk sites or independently verifying that machines had actually been installed.[4] Instead, both men sim-

---

[4]Castro claimed only to have visited a few kiosk sites located near NSD's offices.

ply took Bevilacqua's word for it when BVC confirmed that kiosks were up and running. On every occasion when he inquired about a missing kiosk, Castro testified, Bevilacqua or his employees reported that the kiosk in question had been moved to another location or that its installation had been temporarily delayed because of unforeseen technical problems. Castro admitted that he accepted Bevilacqua's representations essentially at face value. "BVC would always have the appropriate response as to why [the machine] wasn't there," Castro testified. "So on the surface, problem solved." Despite its contractual obligations to place machines for its customers, NSD never sought or received any physical or written confirmation that kiosk installation was continuing apace or that individual machines were actually operational. "We never got anything in writing from them that would verify that there was a machine deployed," Castro said. "Generally, it was when the first [minimum monthly payment] check went out to the client. That's how it was verified."

Castro also acknowledged that NSD had deliberately refrained from delving too deeply into BVC's business practices:

> I felt at the time the need for me and Ed to remain separate was essential. . . . Ed's favorite saying was, "Charlie and I have, like, a Chinese wall built between us." That was his — and to some degree that was true. My role was to sell machines. His role was to install, maintain, service, et cetera, the machinery, submit payments to the client[s] of the machines. We were very careful not to cross those boundaries.

This "Chinese wall" apparently remained in place even after December 2003, when Bevilacqua privately admitted that BVC was unable to meet installation demand. Until the fraud was ultimately brought fully to light in March 2004, NSD continued to promulgate its high profitability projections, to

promise its customers that kiosks could be operational in as little as 30 days, and to aggressively market and sell the business opportunities. In fact, the period between late 2003 and early 2004 saw NSD's highest sales of any time during its four-year relationship with BVC.

## II.    Retention of Defense Counsel

In late 2004, the FTC began investigating Appellants for their role in the fraud. In meetings with Castro and his former lawyer Peter Spivack, FTC staff members expressed their belief that Appellants could be held liable for violations of the FTC Act and the Franchise Rule. The FTC provided Spivack with a draft complaint alleging such violations, and from November 2004 until early February 2005, the parties engaged in protracted negotiations in an effort to avoid a civil lawsuit. In the context of those negotiations, Castro provided the FTC with sworn financial disclosure statements, which included information regarding two custodial accounts held by Relief Defendant Phyllis Watson, Castro's mother-in-law, for the benefit of Castro's minor children. According to the financial disclosures, the custodial accounts contained $839,494. In contrast, the aggregate reported value of all of Castro's personal bank accounts was approximately $25,000. On January 6, 2005, FTC staff members questioned Castro about the origin of the funds in the custodial accounts. Castro claimed that the funds had been held in trust for his children for a number of years. He did not disclose during the interview, however, that earlier that very day, Watson had withdrawn roughly $888,000 from the custodial accounts in the form of a cashier's check and signed the check over to Castro and his wife.

On January 14, 2005, Castro signed a retainer agreement with attorney Jeffrey Benice. According to Benice, Appellants paid him a one-time lump sum of $375,000 pursuant to a "flat fee arrangement," in which Benice agreed to fully represent Appellants throughout the duration of their litigation with the

FTC. The agreement designated all fees as "earned upon receipt," apparently with the intent that the funds would immediately become Benice's property upon payment. Castro also engaged attorney Marc Forsythe as co-defense counsel, paying Forsythe $500,000 under a similar up-front fee arrangement.[5] It is undisputed that Castro paid Benice and Forsythe using the funds that had been surreptitiously withdrawn from the custodial accounts eight days earlier. At the time of the fee arrangement, the custodial funds represented more than 90 percent of Castro's liquid assets. Benice stated that, at the time of payment, he "understood [Appellants] were in a dispute with the FTC and that the FTC *could* eventually take action against them." He denied, however, having any "knowledge that the FTC intended to seek" a freeze on Appellants' assets in connection with this litigation. Benice also stated that, prior to accepting payment, he investigated financial records for Castro and NSD, discussed the case with his clients and co-counsel, and learned of Castro's cooperation with the FBI investigation. Though his declaration before the district court made no mention of this fact, Benice asserted at oral argument before this panel that he was "absolutely" aware of the draft complaint provided by the FTC. Benice further stated at oral argument that his co-counsel Marc Forsythe had conferred with Spivack before assuming the case. At that time, neither Benice nor Castro reported to the FTC that the custodial account funds had been used to pay legal fees.

On February 2, 2005, the FTC discontinued its settlement negotiations with Castro after Castro refused to comply with further requests for information regarding the custodial accounts. On March 31, 2005, the Federal Trade Commission filed a civil complaint in the United States District Court for the District of Nevada against Castro, High, NSD, and three

---

[5]On February 7, 2005, Forsythe's firm transferred $270,000 back to Watson as trustee of a newly created trust account purportedly benefitting Castro's children. Forsythe and the FTC subsequently reached a settlement in which Forsythe turned some portion of his fees over to the FTC.

other companies owned by Castro.[6] The FTC sought both a permanent injunction to bar Appellants from selling the sham business opportunities and equitable monetary relief to disgorge the proceeds of the kiosk scheme. On April 7, 2005, District Judge Lloyd George issued a temporary restraining order freezing all of Appellants' assets, including those held by third parties. In a faxed letter dated April 27, 2005, the FTC informed Benice that it believed the funds he had received pursuant to his arrangement with Castro were properly subject to the freeze.

## III. Conclusions of the District Court

Prior to trial, the FTC and Appellants filed cross-motions for summary judgment. Finding no material issues of fact, Judge George denied Defendants' motion, granted the FTC's motion, and found the Corporate Appellants, Castro and High, personally liable for equitable monetary relief. The district court observed that, despite the disavowals of Castro and High, the undisputed evidence was sufficient to establish that both men had the requisite knowledge to incur individual personal liability for equitable relief. The court explained:

> NSD's sales agreement and offering circular . . . incontrovertibly obligated NSD to locate and install the kiosks, and it was a misrepresentation for NSD

---

[6]Castro and his wife also own all of the companies named as Defendants in this action. There is substantial overlap among the companies, and the district court found them all to constitute a single enterprise; they share ownership and management (namely, Castro), telephone numbers, employees, e-mail systems, and all were involved in the promotion and sale of internet kiosks. The other three Castro companies were primarily marketers and sellers of public payphone and jukebox business opportunities, but the companies participated in an exchange system with NSD, dubbed the "Diamond Program," which enabled consumers who had initially invested in unprofitable payphone or jukebox opportunities to swap those investments for NSD's internet kiosk offerings. The parties do not dispute that Castro controlled the business activities of all of these companies.

to so promise given defendants' knowledge that the installations were not being done, or their reckless disregard for why. . . . [NSD] did next to nothing to verify that purchasers had actually acquired ownership of an operating kiosk, or that the kiosks actually had been placed as promised. . . . [A]t a minimum, Castro should have verified that NSD's obligation to locate and install the kiosks was being accomplished by Bevilacqua by (1) checking on at least some of the physical sites where the kiosks were located, or even ask[ing] for photos to confirm the placements, (2) requesting some kind of documentary evidence that the kiosks had been located at specific sites (for instance, contracts between Bevilacqua and the owners of the locations where the kiosks had been placed), or (3) requiring some form of verifiable information regarding the usage or profitability of the kiosks that BVC claimed to have installed. . . . Instead, not only did Castro take a hands-off approach to Bevilacqua's operation, but he complied with and perpetuated a "Chinese Wall" between NSD and BVC regarding installation and maintenance activities.

. . . .

Castro claims that he was not told of abnormalities at BVC until March 2004. The FTC evidence, however, establishes that numerous notices of concern about BVC were received by Castro and NSD. . . . [E]ven after NSD admittedly received definitive notice from agents in November 2003 that they had checked on the supposed location of their kiosk[s] to find nothing there, Castro went no further than to make inquiry of Bevilacqua, merely accepting his explanation about the moving of the kiosk to another location, or the lack of internet service to a particular location. In sum, there is no room for defendants to

claim that Castro was being duped by Bevilacqua about there being no significant problems with the installation of the kiosks. The facts put Castro and High, as sophisticated businessmen in the field, on notice of installation and other problems, and they recklessly disregarded those warnings.

(Summ. J. Order, Sept. 29, 2006, at 10-13.) Judge George also found that the NSD kiosk venture satisfied the criteria for being a traditional services franchise and that Appellants had violated the FTC's Franchise Rule by making misleading statements in the disclosure agreement circular provided to customers. (*Id.* at 15-16.)[7]

After considering additional supplementary briefing on the issue, the district court further found that the $375,000 in legal fees Appellants had paid Benice were derived from the fraudulent kiosk sales. The court determined that Benice had negotiated his fee arrangement after receiving notice that "there was reason to believe that [Appellants] had violated the [FTC] Act and Franchise Rule" and that Appellants had failed to rebut evidence that Benice "knew that the funds were transferred from accounts that were the very subject of the FTC settlement negotiations." (Order, Sept. 17, 2007 at 1-2.) Under those circumstances, the court said, it could not "accept that defense counsel's fee arrangements were made in good faith." (*Id.* at 2.) Finding that the funds were indeed traceable to Appellants' wrongful conduct, the court imposed a constructive trust and ordered Benice to return $238,300 in consumer funds to the FTC. Because, prior to March 24, 2006,

---

[7]The FTC urges that we affirm the district court's order without reaching the issue of liability under the FTC Act by recognizing the Franchise Rule violations as an unchallenged alternative basis for the district court's decision. We may affirm the grant of summary judgment on any basis supported by the record and need not reach each ground relied upon by the district court. *Newton v. Diamond*, 388 F.3d 1189, 1192 (9th Cir. 2004). Without questioning the merits of the FTC's argument, we elect to address the substantive arguments Appellants have raised before this court.

"there ha[d] been some question regarding whether counsel for [Appellants] would be entitled to payment of their reasonable fees from frozen assets," the court, in equity, permitted Benice to retain the fees he had earned up to that date in the amount of $136,700. (*Id.*)[8]

The court entered final judgment against Defendants on March 5, 2009. The order provided that the Corporate Appellants, Charles Castro and Gregory High, were jointly and severable liable for more than $18.8 million "as equitable monetary relief to redress consumer injury." (Final J., Mar. 5, 2009, at 8-9.) The order also directed Benice to segregate $238,300 and to render the funds to the FTC within 10 days of receiving actual notice of final judgment. (*Id.* at 11-12.) According to the FTC, Benice has not yet delivered the funds as ordered. Defendants filed a timely Notice of Appeal on April 3, 2009.

## *DISCUSSION*

### I.  Summary Judgment Against Individual Appellants

Appellants first argue that the district court improperly granted summary judgment on the issue of whether Castro and High were personally liable for equitable monetary relief.[9]

---

[8]The court explained that its calculation was based on an hourly rate of $300 multiplied by the number of hours Benice billed up until March 24, 2006, the date by which the court determined Benice should have had "clear notice" that Appellants' assets would be subject to equitable relief. (Order, Sept. 17, 2007, at 1-3; Order Jan. 7, 2009, at 1-2.) As discussed briefly in the next section, Appellants also take issue with this calculation, saying the court should have calculated fees based on an hourly rate of $450.

[9]Appellants do not take issue with the district court's determination that both Castro and High are liable for injunctive relief under the FTC Act. Individual liability for injunctive relief under the Act has no mental state requirement, and Appellants do not dispute that the FTC has proven the two necessary elements: "(1) that [NSD] committed misrepresentations or

We review the district court's grant of summary judgment *de novo* to determine whether, viewing the evidence in the light most favorable to the non-moving party, there are genuine issues of material fact and whether the lower court correctly applied the relevant substantive law. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). For the reasons explained below, we affirm.

## A.    Individual Liability Under the FTC Act

**[1]** Section 5 of the FTC Act prohibits deceptive acts or practices in or affecting commerce and imposes injunctive and equitable liability upon the perpetrators of such acts. 15 U.S.C. § 45(a). Businesses and individuals may cause consumer harm as contemplated by the FTC Act in a variety of ways. *See FTC v. Neovi, Inc.*, ___F.3d___, 2010 WL 2365956, at *1, 4-5 (9th Cir. June 15, 2010) (affirming summary judgment against a software marketer that had shown a "profound lack of diligence" in response to a "prodigious number of [consumer] complaints" regarding fraudulent use of its software). In order to establish individual liability to make equitable restitution under the FTC Act, the FTC must prove that an individual "had *knowledge* that the corporation or one of its agents engaged in dishonest or fraudulent conduct, that the misrepresentations were the type upon which a reasonable and prudent person would rely, and that consumer injury resulted." *FTC v. Pub'l Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th cir. 1997) (internal quotation marks omitted) (emphasis added). Only the first element—knowledge—is disputed here. The FTC may establish knowledge by showing that the individual defendant "had actual knowledge of mate-

---

omissions of a kind usually relied on by a reasonably prudent person, resulting in consumer injury, and (2) that [both Castro and High] participated directly in the acts or practices or had authority to control them." *FTC v. Pub'l Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997) (quoting *FTC v. Am. Standard Credit Sys., Inc.*, 874 F.Supp. 1080, 1087 (C.D. Cal. 1994)).

rial misrepresentations, [was] recklessly indifferent to the truth or falsity of a misrepresentation, or had an awareness of a high probability of fraud along with an intentional avoidance of the truth." *Id.* (quoting *FTC v. Am. Standard Credit Syst., Inc.,* 874 F.Supp. 1080, 1089 (C.D. Cal. 1994)). The FTC is not required to show that the defendant actually intended to defraud consumers. *Id.* As this court has previously observed:

> Questions involving a person's state of mind, e.g., whether a party knew or should have known of a particular condition, are generally factual issues inappropriate for resolution by summary judgment. However, where the palpable facts are substantially undisputed, such issues can become questions of law which may be properly decided by summary judgment. But summary judgment should not be granted where contradictory inferences may be drawn from such facts, even if undisputed.

*Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985) (internal citations omitted). Thus, the question we address here is whether the undisputed facts of this case admit of some reasonable inference other than the conclusion that Castro and High acted with either (1) actual knowledge, (2) reckless indifference to truth or falsity, or (3) an awareness of a high probability of fraud and an intentional avoidance of the truth with respect to any of the admitted misrepresentations. We concur with the district court that the undisputed facts admit of no other inference.

### B. Appellants' Personal Knowledge

**[2]** Appellants attest to numerous efforts that, they claim, Bevilacqua undertook to conceal the full scope of BVC's malfeasance from NSD. They also point to Castro's cooperation with law enforcement as evidence that Castro and High were merely unwitting participants in Bevilacqua's fraud. Appel-

lants contend that the district court improperly disbelieved or ignored this evidence when it granted the FTC's summary judgment motion. To the contrary, we conclude that the district judge drew all reasonable inferences in the Appellants' favor and assumed that both Castro and Gregory High were, as they claimed, not privy to every detail or contour of the fraud committed by Bevilacqua and BVC. That assumption does not, however, preclude a finding that both men were aware—as they in fact admitted—that many of NSD's representations regarding kiosk operation, installation, and profitability were false or misleading. For example, Castro testified that NSD's repeated predictions of dramatic growth made him "want to choke." He acknowledged Bevilacqua's private confession that the achievement of his installation projections was all but impossible, as BVC was already far behind in meeting its installation obligations and had only limited cash reserves. High also admitted that he knew of substantial problems and delays in BVC's installation of kiosks. High was responsible for assigning kiosk locations to consumers, and in that position, regularly received reports from BVC acknowledging that kiosks were not being timely installed in assigned sites.

[3] Castro also implicitly acknowledged that Appellants knew the revenue projections disseminated by NSD were unsupported and misleading. Appellants do not dispute that they distributed promotional materials that promised a rate of return, on average, of some $1,100 per month from kiosk machines, and predicted that well-placed machines would ultimately generate more than $1,000 per day.[10] Appellants

---

[10]Appellants now contend their revenue projections were based on third-party market research and reasonable predictions about the growth of the kiosk business model. They also point to passages in their business offering documents, which purport to disclaim the profit representations, stating, *inter alia*: "Actual results vary from unit to unit and NSD cannot estimate the results of any particular business." As the district court correctly determined, however, there is no evidence that all of NSD's customers or potential customers were, in fact, provided with these fine-print disclaimers. In fact, the FTC's evidence shows that not all purchasers signed or received these documents.

also acknowledge that they promoted and disseminated BVC's management agreement, which promised minimum revenue payments based, in part, on these projections. In his deposition, Castro conceded that it was "not reasonable" for customers to expect that any given machine was "going to do $1,000 a month." He admitted that he knew of no machine, no matter how well-placed, that was capable of generating over $400 per month.[11] This admission demonstrates that the $1,000 per day claim was not only overstated or reflective of atypical results; it was plainly unreasonable, given the state of NSD's kiosk deployment and revenue reports. *See FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1267-68 (S.D. Fla. 2007) (holding that nearly identical revenue projections for internet kiosks were material misrepresentations under the FTC Act). Yet NSD repeatedly disseminated these material misrepresentations, and Castro himself approved advertising materials that set forth these claims. This undisputed evidence supports only one conclusion: that Appellants had actual knowledge that at least some of NSD's representations were false and potentially misleading.

Moreover, throughout the relevant period, Castro and High also received numerous agent and customer complaints exposing that kiosks were not, in fact, located at the sites where BVC had represented them to be. Appellants have never disputed the authenticity of the voluminous customer complaint record compiled by the FTC in this case. Castro warned Bevilacqua that the recurring complaints were becoming a "huge issue" and acknowledged that some of the complaints echoed his own concerns and suspicions about BVC's capabilities. For his part, High was actively complicit in concealing the non-installation of kiosks from NSD's customers. He admitted to assigning customers to kiosk locations that were far from where they lived (and, hence, more difficult for

---

[11] In fact, the reality was even worse than Castro acknowledged. The undisputed evidence is that even those few NSD's machines that were actually operational generated almost no money at all.

customers to visit and discover as fraudulent). Despite aware-ness of this "huge issue," neither High nor Castro ever made any effort to restrain NSD's sales efforts or to disclose to the public that NSD was having difficulty meeting its installation obligations. Nor did they seek to independently confirm whether the units that NSD promised to provide for its cus-tomers did, in fact, exist at all.

[4] Even assuming that Castro and High believed Bevilac-qua's repeated excuses and deceptions as they now claim, Appellants are not relieved of personal liability. The FTC Act also imposes liability upon individuals who act with "reckless indifference" to truth or falsity.[12] In its sales agreements, NSD assumed an affirmative contractual obligation to locate and obtain sites for its customers' kiosk business opportunities. The company also assumed an obligation to ensure that those kiosks ultimately became operational in a timely manner. Though it delegated the work of manufacturing and installing kiosks to BVC, NSD remained solely responsible for fulfill-ing its contractual duties. In this light, Appellants' failure to investigate numerous consumer complaints and their deliber-ate construction of a "Chinese wall" between NSD and BVC rises to the level of reckless indifference.

[5] In the face of numerous warning signs—multiple cus-tomer complaints, admitted delays, BVC's suspicious finan-cial practices, and Bevilacqua's false statements—Castro and High failed to undertake even modest due diligence on behalf of their customers. They never sought to independently verify any of Bevilacqua's fraudulent claims about kiosk sites or

---

[12]"While 'the term recklessness is not self-defining,' the common law has generally understood it in the sphere of civil liability as conduct violat-ing an objective standard: action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.' " *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007) (quoting *Farmer v. Bren-nan*, 511 U.S. 825, 836 (1994)); *see also* Restatement (Second) of Torts § 500 (1965) (recklessness entails the creation of an unreasonable risk of harm by the breach of some legal duty).

revenue. They did not require written confirmation from BVC that kiosks were in fact installed as reported. They did not request an independent audit of BVC's financial records. They failed to review or confirm the existence of contracts that Bevilacqua claimed to have with desirable kiosk locations, and they did not visit specific sites in order to confirm BVC's representations that kiosks were operational. There were myriad red flags that would have led a reasonable person to suspect that something was amiss at BVC, such that the company's ability to provide for the timely installation of functional kiosks was seriously undermined. Despite their contractual obligations to provide operational kiosks for their customers, Castro, High, and NSD continued to turn a blind eye toward the problems at BVC and sold the fraudulent business opportunities to new investors faster than ever. We agree with the district court that "by not crossing [the Chinese wall they perpetuated] when, in fact, NSD had promised to provide customers with a functioning kiosk, Castro, High, and NSD, as a matter of law, were recklessly indifferent to the truth or falsity of the representations it was making to consumers." (Summ. J. Order, Sept. 29, 2006, at 11.) The district court properly entered summary judgment in favor of the FTC on this issue.

## II. Imposition of Constructive Trust Upon Attorneys' Fees

We next address whether the district court committed reversible error by imposing a constructive trust upon $238,300 in fees that Castro paid to defense counsel Jeffrey Benice. For the reasons explained below, we affirm the district court's order.

### A. Applicable Law

[6] The FTC Act endows the district court with broad authority to " 'grant any ancillary relief necessary to accomplish complete justice,' " including the power to compel the

payment of restitution to injured consumers. *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (quoting *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1102 (9th Cir. 1994)). Consistent with the Act's expansive statutory authorization, this court reviews a district court's grant of equitable relief under the FTC Act only for abuse of discretion or the erroneous application of legal principles. *See FTC v. Pantron I Corp.*, 33 F.3d, 1088, 1102 (9th Cir. 1994). Similarly, factual findings relating to the payment of attorneys' fees are also reversed only for clear error. *See, e.g., Berkla v. Corel Corp.*, 302 F.3d 909, 917 (9th Cir. 2002); *FTC v. Assail, Inc.*, 410 F.3d 256, 262 (5th Cir. 2005).

**[7]** Constructive trust is a form of remedy that is "flexibly fashioned in equity to provide relief where a balancing of interests in the context of a particular case seems to call for it." *In re N. Am. Coin & Currency, Ltd.*, 767 F.2d 1573, 1575 (9th Cir. 1985). It is a creature of the common law, rather than any federal statute. *Id.* Thus, while the FTC Act's broad authorization of equitable remedies is the immediate source of the district court's power to fashion relief in this case, we also look to common law principles of equity to determine whether the district court's application of constructive trust constitutes legal error. At common law, where property has been obtained by fraud, a court in equity "has jurisdiction to reach the property either in the hands of the original wrongdoer, or in the hands of any subsequent holder" and to convey that property to "the one who is truly and equitably entitled to the same." *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 251 (2000) (quoting *Moore v. Crawford*, 130 U.S. 122, 128 (1889)). "Importantly, that a transferee was not 'the original wrongdoer' does not insulate him from liability for restitution." *Id.* If, however, an innocent third-party transferee purchases ill-gotten assets for value, in good faith, and without actual or constructive notice of the wrongdoing, the third-party transferee cannot be held liable for restitution and the assets are not the proper subject of a constructive trust. *Id.* Known as the bona fide purchaser rule,

this exception grants an innocent transferee a higher right to the obtained assets than the victim of the original fraud. *See id.*; *CRS Recovery, Inc. v. Laxton*, 600 F.3d 1138, 1144-45 (9th Cir. 2010) (discussing the *bona fide* purchaser principle in the context of California's law of conversion).

The parties' arguments before this court rely on these common law principles. First, Appellants contend, the monies paid to Benice are not the proper subject of a constructive trust because the evidence before the district court does not establish that the funds were the proceeds of an unlawful scheme. Second, Appellants urge, even assuming the fees were paid with ill-gotten funds, Benice was a *bona fide* purchaser because he supplied legal services in a good-faith exchange and lacked notice that the funds were derived from unlawful business practices. The FTC disputes these contentions. The district court found that Benice had been paid with tainted funds, that the fee arrangements were not made in good faith, and that Benice had sufficient notice to preclude his status as a *bona fide* purchaser. We conclude that those findings are supported by the evidence and that Judge George's conclusions are sound.

## B.   The Source of the Funds

The district court found that the FTC had presented clear and convincing evidence that the funds Castro paid to Benice were derived from the unlawful kiosk scheme. Using several methods of analysis, FTC financial expert Kenneth Kelley determined that all of the funds withdrawn from the custodial accounts and used to pay Benice could be traced to NSD and the other Castro companies. According to Kelley's analysis, 90 percent of the funds were traceable to NSD's accounts and revenue from the kiosk scheme. The remaining funds were all attributable to at least one of the Castro companies, but because those entities regularly transferred money to one another and paid each others' expenses, Kelley could not state conclusively which company initially generated the funds.

**[8]** Based on the FTC's evidence, the district court concluded that all of Castro's businesses formed a common enterprise and were co-participants in the unlawful practices. Appellants call this finding "meritless" and insist that, because the FTC failed to demonstrate with exact precision which funds initially came from which companies, the district court erred in imposing a valid constructive trust. Far from being meritless, however, the district court's conclusion appears eminently reasonable. Our cases hold that entities constitute a common enterprise when they exhibit either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues. *See SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991); *Brodt v. Bache & Co., Inc.*, 595 F.2d 459, 460 (9th Cir. 1978). In this case, the FTC presented evidence of both. The undisputed evidence is that Castro's companies pooled resources, staff, and funds; they were all owned and managed by Castro and his wife; and they all participated to some extent in a common venture to sell internet kiosks.[13] Thus, all of the companies were beneficiaries of and participants in a shared business scheme, and the common revenue generated in the course of that scheme was the proper subject of the court's equitable powers under the FTC Act.

**[9]** The remedy of constructive trust was appropriate here despite the fact that the res of that trust encompassed funds that had been commingled among several participants in the same unlawful enterprise. The FTC presented substantial evidence that traced the custodial account funds to Appellants' statutory violations, and the district court did not err when it fashioned equitable relief based on this evidence.

### C.  *Bona Fide* Purchaser Rule

---

[13]*See supra* note 6.

Appellants also invoke the *bona fide* purchaser rule and contend that Benice is entitled to his full fee because he accepted the ill-gotten money "in good faith and after a diligent review of the circumstances." (Appellant's Br. at 35.) The district court properly concluded, however, that Appellants had failed to establish that Benice acted with good faith and without notice, that is, he did not discharge his duty of inquiry.

**[10]** An attorney is an "officer of the court" who, by virtue of his or her professional position, undertakes certain "special duties . . . to avoid conduct that undermines the integrity of the adjudicative process." ABA MODEL RULES, Rule 3.3, Cmt. 2. These special duties apply with full force to the manner by which an attorney may collect his or her fee. *See Commodity Futures Trading Comm'n v. Co Petro Marketing Group*, 700 F.2d 1279, 1285 (9th Cir. 1983) ("As an officer of the court, [attorney] was under a duty to inquire as to the exact terms of the district court's decision before depositing [his fee] check [in violation of a contemporaneous injunction].") For example, it is well established that funds derived from criminal activity and used to pay attorneys' fees may be "subject to forfeiture, even in the attorney's hands." *In re Moffitt, Zwerling & Kemler, P.C.*, 846 F.Supp. 463, 474 (E.D. Va. 1994), *aff'd United States v. Moffitt, Zwerling & Kemler, P.C.*, 83 F.3d 660, 665 (4th Cir. 1996); *see also In re Bell & Beckwith*, 838 F.2d 844 (6th Cir. 1988) (attorney not entitled to *bona fide* purchaser status where the circumstances surrounding the payment of his fees were sufficient to place him on notice that client's funds were obtained by fraud). Extending this rationale to fees paid with the proceeds of unlawful business practices under the FTC Act, the Fifth Circuit stated:

> [T]here is a clear principle that an attorney is not permitted to be willfully ignorant of how his representation is funded . . . . [W]hen taken together, [the legal authorities] teach that when an attorney is objectively on notice that his fees may derive from

> a pool of frozen assets, he has a duty to make a good faith inquiry into the source of those fees. Failure to make such an inquiry in the face of this duty will result in disgorgement of the funds.

*Assail*, 410 F.3d at 265. The "clear principle" recognized in *Assail* and *Bell & Beckwith* is applicable here: an attorney is not permitted to be willfully ignorant of how his fees are paid. Though the funds in this case were not yet subject to an asset freeze at the time of the fee arrangement, the record clearly demonstrates sufficient facts to trigger Benice's duty of inquiry as to the source of the funds. *See Assail*, 410 F.3d at 266; *Bell & Beckwith*, 838 F.2d at 849-50.

At the time that Castro and Benice entered into the flat fee arrangement, Appellants and their previous counsel had been engaged for months in protracted negotiations with the FTC. The FTC had provided Castro with a draft complaint alleging violations of the FTC Act and the Franchise Rule, and Castro had provided the FTC with sworn financial statements, revealing that almost all of his liquid assets were housed in the custodial accounts from which Benice was ultimately paid. Benice himself admits that he "understood [Appellants] were in a dispute with the FTC and that the FTC *could* eventually take action against them." In oral argument before this court, Benice went even further, acknowledging that he was aware of the draft complaint and stating that his co-counsel Marc Forsythe had discussed the status of the FTC negotiations with Peter Spivack. "I knew exactly the status [of Appellants' negotiations with the FTC]," Benice told this court. Benice, however, never spoke personally with Spivack. Nevertheless, Benice claims that he independently concluded that the money used to pay his fee came not from the alleged violations of the FTC Act but from Castro's legitimate business activities. Benice admits that his independent conclusions were based primarily on information provided by Castro himself.

**[11]** Thus, on the one hand, Benice claims to have satisfied his professional obligations by undertaking an inquiry as to the source of the funds. On the other, however, he asserts that he learned of no circumstances in the course of his inquiry that were sufficient to place him on notice that his fees were potentially derived from the alleged unlawful practices. The evidence satisfies us that an objectively reasonable and diligent inquiry would have revealed that Appellants' assets were potentially tainted by their participation in the kiosk scheme. *See Assail*, 410 F.3d at 266; *Moffitt*, 846 F.Supp. at 474-75. Benice claims to have relied on Castro's representations, but the draft complaint and other materials that Benice was aware of should have cast doubt on the reliability of Castro's statements. All of Castro's businesses were named in the draft complaint as participants in the unlawful scheme, and the millions of dollars generated in the course of that scheme were Appellants' primary alleged source of income. Benice also claims to have reviewed Appellants' financial documents, which would have confirmed not only that the kiosk scheme was the primary source of revenue for Castro's companies but also that the custodial accounts from which Benice was paid contained almost all of Castro's liquid assets. Castro had provided sworn statements to the FTC regarding the custodial account funds, and Benice knew or should have known that these funds were the subject of Castro's ongoing settlement negotiations with the FTC.

**[12]** A diligent review of the circumstances—such as the one Benice claims to have undertaken—would also have revealed what claims were asserted against Appellants and which of Appellants' assets were likely subject to disgorgement if the FTC prevailed on those claims. In light of the FTC's allegations that the custodial funds were derived from a fraudulent scheme, Benice could not sufficiently discharge his duty of inquiry merely by relying on the contrary representations of his client. *See Assail*, 410 F.3d at 266 ("Once on notice, [attorney] needed to do far more than simply take his client at his word that the fees were not tainted. . . . Trusting

[his client's] truthfulness unconditionally was especially unreasonable considering that he was accused of fraud, an allegation going directly to his honesty."). Benice's acceptance of a nonrefundable $375,000 flat fee under such circumstances unwittingly provided Castro with a vehicle to transfer a substantial portion of his assets seemingly out of the FTC's reach. Just eight days after secretly emptying the custodial accounts, Castro made a $375,000 cash payment to Benice. That Castro failed to disclose the withdrawal of the custodial account funds to the FTC supports the inference that Castro was deliberately attempting to insulate or conceal his assets in advance of an asset freeze. Even if Benice notified the district court and the FTC of the terms of his retainer agreement, and did not knowingly act to facilitate Castro's attempted obfuscation, we cannot conclude that Benice's acceptance of such a payment was in good faith and without notice.

**[13]** In sum, we conclude that although Appellants' assets were not yet frozen when Benice accepted his fee, Benice received sufficient notice to trigger "a duty to make a good faith inquiry into the source of th[e] fee[ ]." *Assail*, 410 F.3d at 265. Benice failed to discharge this duty because he relied primarily on Castro's representations and did not discuss the source of his fees with Appellants' former counsel. Considering the totality of the circumstances, Benice's inquiry was not objectively reasonable. The district court's conclusions that Benice was not a *bona fide* purchaser and did not discharge his duty of inquiry were well supported, and its order imposing a constructive trust was neither an abuse of discretion nor legally erroneous.

## D.   Benice's Equitable Receipt of Fees

**[14]** The district court did not entirely divest Benice of his fees in this case. Instead, the court permitted Benice to retain, in equity, his reasonable fees for work done before Appellants' assets were frozen. In a three-sentence paragraph at the close of their brief, Appellants assert that the district court

erred when calculating the fees granted to Benice. The court based its calculation on a $300 hourly rate, rather than the $450 hourly rate that Benice had initially requested. Without elaborating, Appellants claim that the district court's refusal to accept the $450 hourly rate was "unsupported." (Appellant's Br. at 50.) Appellants' unsupported assertion does not satisfy us that the district court erred. *See Camacho v. Bridgeport Financial, Inc.*, 523 F.3d 973, 980 (9th Cir. 2008) (fee applicant bears the burden of producing evidence to support requested rates). On this record, we hold the court did not abuse its discretion in granting Benice a limited fee recovery of $136,700.

## *CONCLUSION*

We AFFIRM the decision of the district court in its entirety.